

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-28-2002

# Carter v. McGrady

Precedential or Non-Precedential: Precedential

Docket No. 01-1738

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Carter v. McGrady" (2002). *2002 Decisions.* Paper 303.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/303

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed May 29, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-1738

RICHARD CARTER, SCI-MAHANOY PARA-LEGAL
ASSISTANT/ ON BEHALF OF HIMSELF AND PRISON
POPULATION

v.

JAMES MCGRADY, CAPTAIN, AND; MARY CANINO,
HEARING EXAMINER, IN THEIR INDIVIDUAL AND
OFFICIAL CAPACITY
(Eastern District of PA Civil #94-cv-7163)

RICHARD CARTER, on behalf of himself and all those
similarly situated

v.

MARTIN L. DRAGOVICH, SUPERINTENDENT; EDWARD J.
KLEM, Superintendent of Centralized Services;
COMMONWEALTH OF PENNSYLVANIA; PENNSYLVANIA
DEPARTMENT OF CORRECTIONS; SCI AT MAHANOY;
JAMES MCGRADY, CAPTAIN (Eastern District of PA Civil
#96-cv-6496)

Richard Carter, Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
District Judge: Honorable J. Curtis Joyner

Argued: February 4, 2002

Before: BECKER, Chief Judge, McKEE and BARRY,
Circuit Judges.

(Filed: May 29, 2002)

JOSEPH A. SULLIVAN, ESQUIRE
EDWARD W. FERRUGGIA, ESQUIRE
KIMBERLY M. KAPLAN, ESQUIRE
 (ARGUED)
LISA M. SCIDURLO, ESQUIRE
ADAM C. BONIN, ESQUIRE
Schnader, Harrison, Segal & Lewis,
 LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103

Counsel for Appellant

          D. MICHAEL FISHER, ESQUIRE
          Attorney General
          BETH ANNE SMITH, ESQUIRE
            (ARGUED)
          Senior Deputy Attorney General
          JOHN G. KNORR, III, ESQUIRE
          Chief Deputy Attorney General
          Chief, Appellate Section
          Office of Attorney General
          21 S. 12th Street, 3rd Floor
          Philadelphia, PA 19107-3606

          Counsel for Appellees James
          McGrady, Martin L. Dragovich
          Edward J. Klem and Mary Canino

OPINION OF THE COURT

BECKER, Chief Judge.

This is a prisoner's civil rights case, 42 U.S.C.S 1983,
brought by Richard Carter, an inmate in the custody of the

Pennsylvania Department of Corrections ("DOC"). Carter, an
experienced and assiduous jailhouse lawyer, claims that he
was unlawfully subjected to cell searches and disciplinary
proceedings in retaliation for his jailhouse lawyering, which
he contends was disfavored at the State Correctional
Institute at Mahanoy ("SCI-Mahanoy") where he was
incarcerated at all times relevant to this lawsuit. This
appeal is from the order of the District Court granting
summary judgment for the defendants, James McGrady,
Martin Dragovich, and Edward Klem, all officials at SCI-
Mahanoy, based on the conclusion that Carter did not have
a constitutionally protected right to act as a jailhouse
lawyer and, thus, the defendants were entitled to qualified
immunity.

When this case was before the District Court, the
Supreme Court had yet to decide Shaw v. Murphy , 532 U.S.
223 (2001), which held that prisoners do not have a
freestanding constitutional right to assist other inmates in
filing legal claims. Shaw had asserted such a right, and the
Supreme Court has therefore foreclosed one facet of
Carter's claim. This development has required Carter, who
describes himself in the case caption as "SCI-Mahanoy
Para-Legal Assistant/On Behalf of himself and prison
population," to shift gears and to stress two other
arguments. First, Carter claims that he was retaliated
against for exercising his First Amendment rights. Second,
invoking Turner v. Safley, 482 U.S. 78 (1987), he claims
that there are no reasons related to penological interests
that would otherwise justify the conduct of the prison
officials.

Carter's claim of retaliation for exercising a constitutional

right is governed by Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001). Under Rauser, prison officials may prevail when the plaintiff has made out a prima facie case of retaliation if they prove that "they would have made the same decision absent the protected conduct for reasons reasonably related to legitimate penological interests." Id. at 334. The record reveals that Carter was clearly guilty of egregious violations of prison policy -- stealing a typewriter and unauthorized use of the mails (and other violations as well). We conclude, assuming arguendo that Carter has correctly described the

attitude at SCI-Mahanoy about jailhouse lawyering and that he has made out a prima facie case of retaliation, that there is no genuine issue of material fact that the prison officials would have disciplined Carter for these violations notwithstanding his jailhouse lawyering. Accordingly, we will affirm, albeit on different grounds than those relied on by the District Court. See Narin v. Lower Merion Sch. Dist., 206 F.3d 323, 333 n.8 (3d Cir. 2000). We therefore need not reach the interesting issues raised by Carter's theory that he has a protected First Amendment right to provide legal advice, and that any action taken against him for exercising such a right must be evaluated under Turner.

 I. Facts and Procedural History

On February 25, 1994, Carter executed and transmitted an "outside purchase approval form" for an electric typewriter from a "family member or friend." In due course, a Smith-Corona typewriter arrived at SCI-Mahanoy from Suburban Office Equipment, a vendor located in Ardmore, Pennsylvania. On March 24, 1994, Carter signed an inmate personal property receipt and accepted delivery of the typewriter. A mailroom inspector, Liz Ryan, later informed James McGrady, SCI-Mahanoy's Security Captain, that the vendor had sent a demand letter stating that: (1) no payment had been made for the typewriter; and (2) Carter had obtained the typewriter through the unauthorized use of a credit card.

McGrady investigated the matter by contacting Wallace McLean, who worked for the vendor. McLean informed McGrady that the typewriter had been ordered over the phone using a credit card and that the customer identified the name on the card as Richard Carter. The actual owner of the card, who lived in California, subsequently verified that Carter was not authorized to use that card. McLean faxed certain documents to McGrady, including the sales receipt that indicated that the typewriter was sold to Carter and paid for with a Visa card; the "Retrieval Request Fulfillment Transmittal" containing a copy of a credit card sales slip reflecting that the sale of the typewriter was made by a credit card bearing the name "Richard Carter"; and an inquiry from McLean representing that a typewriter was

shipped from the vendor to Richard Carter and signed for by an SCI-Mahanoy mailroom employee.

On October 19, 1994, thirteen days after the vendor had contacted SCI-Mahanoy about the typewriter, McGrady twice ordered Carter's cell to be searched. In the course of the first search, a corrections officer, M.E. Steinhauer, seized the typewriter. Immediately after the search, Carter was taken to the security office. McGrady testified that Carter told him that an inmate at SCI-Graterford, where Carter was formerly an inmate, had purchased the typewriter for him in return for legal services rendered, but that he had no idea how that inmate purchased the typewriter. Carter denies telling McGrady this, but does admit that he gave McGrady an unsigned affidavit that he prepared, purportedly on behalf of the other inmate, making a statement to this effect.

Carter submits that McGrady then threatened him with discipline should he assist other inmates with legal matters, stating that, "You don't work in the law library here . . . SCI-Mahanoy does not allow inmates to help other inmates with their legal matters." When Carter told McGrady about how he had been helping other inmates for many years, Carter alleges that McGrady responded by saying "I don't care where you were before. We don't allow prisoners to help other inmates." Carter also represents that McGrady said, "if I even hear about you helping other inmates, I will write you up and put you in RHU[Restrictive Housing Unit]."

McGrady subsequently ordered a second search for documentation of the purchase of the typewriter or any other evidence of the unauthorized use of the credit card. In the course of this search, Steinhauer confiscated Carter's personal papers, including all of Carter's legal materials. In the papers seized from Carter's cell, Steinhauer found an envelope from the vendor containing two receipts for the typewriter that were identical to the sales receipt and credit card sales slip that the vendor had faxed to McGrady. Carter testified that, on October 23, 1994, he filed a written request to have his documents returned. The request was denied.

On October 27, 1994, McGrady called Carter to his office to witness the return of legal documents belonging to ten different inmates. Carter testified that, in his presence, each of the inmates that he was assisting was ordered not to allow Carter to review their legal materials and told that anyone who did would be sent to the RHU. This was despite protests that they had no other means of legal assistance. During this meeting, McGrady asked Carter what he was doing with these papers. Carter responded that he was not assigned to the law library as a legal aide but that he was being paid for helping people. McGrady then told Carter that he could not conduct a business while in prison.

Carter responded that he was a court-appointed paralegal and was being paid by the Federal Courts to assist other inmates. Carter produced two documents as evidence of his status as a court-appointed paralegal, but McGrady could not determine from the documents whether Carter was telling the truth.

McGrady thereafter wrote a misconduct report charging Carter with receiving stolen property. At the disciplinary hearing on the charge, Carter was found guilty and sentenced to sixty days disciplinary custody in the RHU. After serving this sanction, he was returned to the general population at SCI-Mahanoy. Carter was also charged by the Schuylkill County District Attorney's Office with unauthorized use of a credit card, theft by deception, receiving stolen property, and conspiracy. He was convicted of the charge of receiving stolen property and given a sentence of two and one-half to five years consecutive to the sentence he is currently serving.

Carter testified that over the course of the next two years he was routinely harassed and searched when entering and leaving the prison library, far more frequently than other inmates. He alleges that these were efforts to search his files to determine which inmates he was assisting with legal matters. On June 5, 1996, his cell was again searched and his legal and personal papers were seized.

In August 1997, an inmate informed Vincent Mooney, the Security Lieutenant at SCI-Mahanoy, that another inmate - Dana Carter (who happened to be the plaintiff's cell-mate) - was holding the inmate's legal papers until he paid Dana

6

Carter money for his legal work. As a result, Mooney ordered a search of Dana Carter's cell. During that search, Corrections Officer Toth discovered an excessive amount of property in the cell, belonging to both Dana and Richard Carter, as well as other inmates, which was deemed to constitute a fire and safety hazard. Mooney ordered the search team to confiscate the property and take it to the security area. Mooney subsequently called Carter (the plaintiff - not his cellmate, Dana) to the security office where he advised him that he was limited to two file boxes of property in his cell. Carter was then allowed to select the paperwork that he wanted to keep, and was told that his remaining paperwork would be stored in the property room, but that paper belonging to other inmates would be returned to those inmates.

Later in August 1997, staff at SCI-Greene, another Pennsylvania prison, advised McGrady that Carter had circumvented mail policies by corresponding with an inmate at SCI-Greene, Donny Unger. Carter concedes that he wrote a note to Unger without seeking authorization for that correspondence. Inmates in DOC custody are prohibited from corresponding with inmates in other state correctional institutions. On the basis of this information,

a routine misconduct search of Carter's cell was conducted in late August. During that search, prison officials confiscated a copy of a newsletter drafted by Carter, "The Last Line of Defense," which advocated prisoner litigation and argued that prison paralegals like himself stood as the "last line of defense." Carter had not requested or obtained approval by the SCI-Mahanoy administration for this newsletter. On August 29, 1997, Carter was charged with misconduct for unauthorized use of the mail. He was found guilty and sentenced to RHU for thirty days.

Carter served thirty days in RHU for the unauthorized use of the mails. He was not thereafter returned to SCI-Mahanoy, but was placed instead in administrative custody pending transfer. He was ultimately transferred to SCI-Dallas, where he remains incarcerated. The transfer was initiated by McGrady, who petitioned the DOC to transfer Carter to another state correctional institution. This transfer decision was based on security concerns,

specifically, Carter's attempts to establish at SCI-Mahanoy various unauthorized groups, including the Ma'at Karast Temple, a religious group that Carter wanted the prison to recognize as an official religion. McGrady also believed that Carter was affiliated with groups that advocate violence. Carter, in contrast, urges that the transfer was done in order to punish him for assisting other inmates, and to prevent him from continuing to help them in the future. He also contends that defendants filed negative parole recommendations against him in May 1995 and February 1996 despite the fact that he has been a nonviolent and generally exemplary inmate, and that this was done in retaliation for his jailhouse lawyering.

Carter filed two separate pro se complaints alleging violations of 42 U.S.C. S 1983. The protracted history of this litigation, not relevant to the outcome, is described in the margin.1 An amended complaint was filed on February 12, 1999, alleging claims under 42 U.S.C. S 1983, based on both access to courts and retaliation for exercise of his First Amendment rights. Carter also pled a conspiracy count under 42 U.S.C. S 1985. Defendants moved to dismiss the

_____

1. In September 1996, Carter filed this S 1983 action against SCI-Mahanoy, Dragovich, and Klem. (C.A. No. 96-6496). He challenged the adequacy of the law library and legal reference aides policy, as well as the legality of the prison restrictions on his ability to practice as a "jailhouse lawyer." Carter alleged that the defendants had violated his right of access to the courts, and that certain actions were taken against him in retaliation for the exercise of his First Amendment rights. Defendants moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the complaint. They maintained that: 1) an inmate had no constitutional right to act as a jailhouse lawyer; 2) Carter's access-to-courts claim failed since he had not suffered any actual injury as a result of their conduct; and 3) Carter's retaliation claim failed since he had no constitutional right to be a jailhouse lawyer, and had failed to allege

facts which showed that the defendants had taken any retaliatory action against him, or knew of or acquiesced in any such retaliation. The District Court denied the motion, concluding that Carter was not asserting an access-to-courts claim. The District Court also granted Carter's motion to consolidate this case with another case he had previously filed, C.A. No. 94-7163, which has a long procedural history. Carter subsequently filed an amended complaint, which subsumes the two consolidated cases and lays the foundation for this appeal.

amended complaint pursuant to Fed. R. Civ. P. 12(b)(6). The Court dismissed Carter's claims against the Commonwealth of Pennsylvania, the DOC, and SCI-Mahanoy on grounds of Eleventh Amendment immunity. Carter's access-to-courts claim was dismissed because he failed to allege an "actual injury" within the meaning of Lewis v. Casey, 518 U.S. 343 (1996). The S 1985 claim was dismissed because "jailhouse lawyers" are not protected under that statute. Thus, all that was left was Carter's retaliation claim against McGrady, Dragovich, and Klem.

Defendants subsequently moved for summary judgment, arguing inter alia that Carter's retaliation claim failed as a matter of law and that they were entitled to qualified immunity. The District Court concluded that the defendants were entitled to qualified immunity because Carter did not have a constitutional right to act as a jailhouse lawyer and granted their motion for summary judgment, from which Carter now appeals. The District Court had jurisdiction pursuant to 28 U.S.C. S 1331. We have appellate jurisdiction pursuant to 28 U.S.C.S 1291. We exercise plenary review over a district court's grant of summary judgment. See Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 441 n.3 (3d Cir. 2000). We set forth the familiar standards governing review of summary judgment motions in the margin.2

II. Discussion

A prisoner alleging that prison officials have retaliated against him for exercising his constitutional rights must prove that: 1) the conduct in which he was engaged was constitutionally protected; 2) he suffered "adverse action" at the hands of prison officials; and 3) his constitutionally

---

2. Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. Pro. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The judge's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

protected conduct was a substantial or motivating factor in the decision to discipline him. Rauser v. Horn , 241 F.3d 330, 333 (3d Cir. 2001) (adopting Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). Once a prisoner has made his prima facie case, the burden shifts to the defendant to prove by a preponderance of the evidence that it "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." Id. at 334 (incorporating Turner v. Safley, 482 U.S. 78, 89 (1987)).

The Supreme Court has made clear that decisions of prison administrators are entitled to great deference. In crafting the appropriate standard of review for prisoners' constitutional claims, the Court observed that "[r]unning a prison is an inordinately difficult undertaking." Turner, 482 U.S. at 85. Moreover, the Court noted that " 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' " Id. (quoting Procunier v. Martinez, 41 U.S. 396, 405 (1974)). Thus, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

In this case, Carter was never charged with misconduct for helping other inmates with legal matters or having their legal materials in his cell. Rather, he was charged with misconduct for undisputed violations of prison policy. The search and seizure of items from his cell were related to these various violations. Carter was discovered with a stolen typewriter in his cell. The cell search uncovered an envelope containing two receipts for the typewriter, identical to the sales receipt and credit card sales slip faxed by the vendor. As a result, Carter was disciplined with sixty days in the RHU.

Moreover, it is not disputed that Carter corresponded with Unger in violation of prison policy. Carter conceded that he wrote a note to Unger without seeking authorization for that correspondence. His cell was searched in connection with this allegation; he was written up and subsequently disciplined with thirty days for this conduct.

10

Additionally, there is no dispute that the amount of property kept by Richard Carter and Dana Carter in their cell exceeded the amount allowed by fire and safety regulations. The materials were seized for this reason, and Carter was allowed to select up to two boxes of his personal material to keep in his cell. Finally, in the course of searching Carter's cell in connection with the unauthorized use of the mails, prison officials found the newsletter, "The Last Line of Defense," a publication of which Carter was the editor and for which he had not requested or obtained approval by the SCI-Mahanoy administration. The foregoing represents a sizeable quantum of misconduct evidence.

Carter contends that notwithstanding these facts all of the actions taken against him were a reflection of defendants' bias against jailhouse lawyers. We note in passing that inmates at SCI-Mahanoy are in fact permitted to act as jailhouse lawyers provided that they do not demand or receive payment for their services. The institution also provided both a law library and inmates assigned to work as legal aides in that library. All inmates have access to the law library, which was open all day, including evenings, from Monday to Friday; on weekends, it was open six to eight hours. Inmates are allowed to confer with each other in the library as long as they are not disruptive. Nevertheless, even assuming, for purposes of this case, that Carter's activity was constitutionally protected, but see Shaw v. Murphy, 532 U.S. 223, 230-31 (2001), supra, and that the searches and subsequent disciplinary action were motivated by hostility to this protected activity, Carter still cannot prevail.

As this Court has previously held, "once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser , 241 F.3d at 334 (emphasis added). Given the quantum of evidence of Carter's misconduct, we cannot say that the prison officials' decision to discipline Carter for his violations of prison policy was not within the "broad discretion" that we must

11

afford them. Thornburgh v. Abbott, 490 U.S. 401, 413 (1989). Even if prison officials were motivated by animus to jailhouse lawyers, Carter's offenses, such as receiving stolen property, were so clear and overt that we cannot say that the disciplinary action taken against Carter was retaliatory. Rather, we conclude that the there is no genuine issue of material fact that such action was "reasonably related to legitimate penological interests," and that Carter would have been disciplined notwithstanding his jailhouse lawyering. Turner, 482 U.S. at 90. The judgment of the District Court will therefore be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

12