

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-20-2008

# Queer v. Westmoreland

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3658

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Queer v. Westmoreland" (2008). *2008 Decisions.* Paper 348.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/348

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3658
_____

LANCE QUEER; INTEGRATED CARE CORPORATION,

Appellants

v.

WESTMORELAND COUNTY; CHRISTOPHER LOUGHNER;
CORRINE ZECCHINI; AUSTIN BREEGLE
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 06-cv-00325)
District Judge:  Honorable Terrence F. McVerry
_____

Submitted Under Third Circuit LAR 34.1(a)
September 29, 2008

Before:  FISHER, CHAGARES and HARDIMAN, *Circuit Judges.*

Filed: October 20, 2008
_____

OPINION OF THE COURT
_____

FISHER, *Circuit Judge*.

Lance Queer and Integrated Care Corporation (ICC) appeal the order of the

District Court granting summary judgment as to their claim under 42 U.S.C. § 1983 that

Westmoreland County refused to renew ICC's contract in retaliation for Queer's protected First Amendment speech. For the reasons set forth below, we will affirm.

I.

We write exclusively for the parties, who are familiar with the factual and legal history of this case. Therefore, we will set forth only those facts necessary to our analysis.

For each fiscal year from 1999 to 2005, ICC through its sole owner Lance Queer entered into a one-year contract with Westmoreland County to provide therapeutic services to special needs children ages 0-3 years old as part of the County's participation in the Early Intervention (EI) Program established under Part C of the Individuals With Disabilities Education Act (IDEA). Under the IDEA, the County is required to offer families of eligible children a choice among qualified service providers and is required to monitor the performance of the service providers. The County's EI Program is administered through the County's Mental Health and Mental Retardation Department (MH/MR). Prior to the start of the 2005-2006 fiscal year, the County's MH/MR Administrator Kathleen Wohlgemuth notified Queer on April 1, 2005, that ICC's contract would not be renewed. Wohlgemuth informed Queer that he would have the opportunity to meet with the County Commissioners prior to the public meeting at which a vote on whether to renew ICC's contract would take place.

The parties vigorously dispute the basis for the County's decision not to renew ICC's contract. In Wohlgemuth's notification letter to Queer, she indicates that her nonrenewal recommendation "was based on the unacceptable content in your Plan of Correction dated March 17, 2005." Queer contends that the real reason ICC's contract was not renewed was because of comments he made to a state official in 2004. In March 2004, Queer informed a state official that the County's MH/MR Program Specialist, Chris Loughner, was improperly denying EI services. This criticism was brought to the attention of the County in April 2004. In June 2004, Loughner and his supervisor, Corrine Zecchini, the MR Program Coordinator, met with Queer to discuss various issues pertaining to ICC, including an email in which Queer referred to a County employee as a "she wolf"; an email sent by Queer to Loughner that contained pornography; promotional activities conducted by Queer and ICC; and training deficiencies. Queer alleges that at the beginning of the meeting Zecchini told him that the County was informed "by a representative of the State that they were contacted by a staff member of [ICC] . . . and that they felt wounded and that they wanted to find out through the front door, not the back door." The County nonetheless renewed ICC's contract for the 2004-2005 fiscal year, and although the amount of the contract was reduced by about 25%, the County later obtained additional funding to ensure that ICC would be paid for any services it provided beyond the contracted amount.

3

In October 2004 the County prepared a report regarding ICC's performance in which the County identified concerns, strengths, and compliance issues. The County delivered the report to ICC in February 2005 and instructed ICC to provide a "Plan of Correction" to remedy the problems identified in the report. The County also met with Queer in March 2005 to discuss the report in an effort to ensure that Queer was aware of the County's concerns. Queer's response to the monitoring report is found in a written letter dated March 17, 2005. The County reacted with alarm to this letter and in particular to the following reference: "IF, there is ever an [ICC] Therapist that definably demonstrates non alignment to this item of issue, by, or through, error, or omission, or due to a flagrant disregard, i [sic] will probably personally shoot them as this item has[.]"

Upon receipt of this letter, Zecchini shared her concerns with her supervisor, Austin Breegle, the Deputy Administrator of the MH/MR Department. Breegle met with Wohlgemuth who asked Breegle to recommend whether ICC's contract should be renewed. Breegle conducted an investigation and ultimately recommended that ICC's contract not be renewed. In an April 21, 2005 memorandum, Breegle listed the following reasons for his recommendation: (1) the "she-wolf" email; (2) the pornographic email; (3) an incident Breegle witnessed at a County meeting in October 2004 where Queer interrupted the meeting dressed in a hula skirt and coconut bra, and proceeded to make comments about being "lei'd by a Queer" as he placed leis around the necks of various individuals; (4) continuing regulatory compliance issues; and (5) the March 17, 2005

4

letter. Breegle noted that "[t]his lack of insight to the inappropriateness of his behavior and results from it should not be exposed to the families and children of Westmoreland County." Breegle and Wohlgemuth then met with the County Commissioners and recommended that ICC's contract for the following year not be renewed.

Queer subsequently brought this suit in the District Court, and following the District Court's grant of summary judgment in favor of the County, Queer timely appealed to this Court.

## II.

The District Court exercised jurisdiction pursuant to 28 U.S.C. § 1331 and we have jurisdiction pursuant to 28 U.S.C. § 1291. Our review of the District Court's grant of summary judgment is plenary. *Carter v. McGrady*, 292 F.3d 152, 157 (3d Cir. 2002). Summary judgment may be granted where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We draw "all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party," *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002), but the nonmoving party cannot simply rely on unsupported allegations in attempting to survive a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

III.

To prove that the County retaliated against Queer for communicating with a state official in March 2004, Queer must show that: (1) he engaged in protected First Amendment speech; (2) the County responded with retaliation sufficient to deter a person of ordinary firmness from exercising his or her rights; and (3) there was a causal connection between the protected First Amendment speech and the retaliation. *Lauren v. Deflaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *Estate of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003). Queer can establish a causal connection by proving either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren*, 480 F.3d at 267. In the absence of such proof, Queer "must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). If Queer establishes a prima facie case of retaliation, the County can defeat the claim by demonstrating that it would have taken the same action even if Queer had not engaged in the protected activity. *Id.*; *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

Queer argues that the District Court erred by ignoring evidence that establishes a causal nexus between Queer's protected First Amendment speech[1] and the County's nonrenewal of ICC's contract, and thus improperly granted summary judgment as to his retaliation claim. Based on our review of the record, we cannot accept this contention. First, there is nothing unusually suggestive about the timing between Queer's protected First Amendment activity and the County's refusal to renew his contract. Queer contacted the state official to complain of the County's practices in March 2004 and over a year later the County decided not to renew ICC's contract. The fact that the County renewed ICC's contract for the 2004-2005 fiscal year following Queer's exercise of his protected speech substantially undermines Queer's assertion that the facts present an unusually suggestive temporal proximity. To the contrary, when we construe the facts in the light most favorable to Queer, taking into consideration his "timeline" of events, it is difficult to discern *any* temporal proximity between Queer's protected speech in March 2004 and the County's nonrenewal decision more than a year later, much less an unusually suggestive temporal proximity. In April 2004 when the County learned of Queer's contact with the state official it did not immediately terminate ICC's then-existing contract, nor did it decline to renew ICC's contract for the following year; rather

---

[1]Although the record reveals a dispute as to whether Queer actually contacted a state official, for the purposes of this appeal only, the County does not challenge Queer's assertion that he exercised his First Amendment right to free speech. Therefore, we do not analyze the first element of a retaliation claim.

it honored its contract with ICC for the remainder of the 2003-2004 fiscal year and for an entire year after that. If there is any event in the record where the timing could be characterized as unusually suggestive of the County's cause for not renewing ICC's contract, it is Queer's March 17 "Plan of Correction" letter, which the County received a mere two weeks before reaching its nonrenewal decision, not Queer's protected activity a year earlier.

Second, the record does not reveal a pattern of antagonism that, when coupled with the timing of Queer's protected speech and the County's nonrenewal decision, establishes a causal link between the two. Queer attempts to demonstrate a pattern of antagonism by pointing to (1) his June 2004 meeting with the County at which time MH/MR Department employees told him they "felt wounded" by the accusations he made to the state and "that they wanted to find out through the front door, not the back door," about such concerns; and (2) the "irregular" and "extensive" review of ICC that the County undertook beginning in October 2004. But Queer's argument that these incidents demonstrate the County's animus towards him is diminished by both his own description of the June 2004 meeting with the County, which he says was "very pleasant," and the fact that the County is required by law to monitor its EI service providers. Thus, it is a stretch to characterize the June 2004 meeting and the October 2004 review as antagonistic, and in any event these occurrences certainly do not establish a pattern of antagonism that gives rise to an

8

inference of a causal connection between Queer's protected activity in March 2004 and the County's nonrenewal decision in April 2005.

Third, the record as a whole, including a review of circumstantial evidence that might suggest that the County's stated reasons for nonrenewal were pretextual, does not establish a causal connection. There simply is not enough evidence from the record as a whole for a reasonable jury to infer that the cause for the County's nonrenewal decision was Queer's exercise of his free speech rights one year earlier. Although Queer sets forth unsupported assertions, conclusory allegations, and mere suspicions of pretext on the part of the County, this is insufficient to survive a summary judgment motion, *see Williams*, 891 F.2d at 460, and thus Queer fails to carry his burden of demonstrating a causal connection between his protected activity and the County's alleged retaliatory action.

Even if Queer could establish a causal connection, his claim would nonetheless fail because the record demonstrates that the County would have still decided not to renew ICC's contract even without a retaliatory motive. Contrary to the conflated arguments made by Queer, this step in the analysis only arises after the plaintiff demonstrates a prima facie case of retaliation. Queer failed to establish the prima facie elements of retaliation, but even if he had, the County would still prevail because it can easily show that its decision not to renew ICC's contract would have been made in the absence of Queer's protected activity. The County had ample, documented reasons for not renewing ICC's contract including Queer's inappropriate emails and inappropriate behavior, ICC's

9

noncompliance with regulations, and most notably, Queer's admittedly "unprofessional" March 17, 2005 letter in which he made a reference to personally shooting his employees if they failed to meet expectations. This letter alone provides a legitimate, nondiscriminatory reason for the County's decision not to continue to allow Queer and ICC access to the families and young children who are the recipients of EI services. Construing the facts in a light most favorable to Queer and drawing all reasonable inferences in his favor, we cannot conclude that the County's decision with respect to ICC's contract would have been different if Queer had not engaged in protected speech a year earlier but had provided the County with the same "woefully inadequate and unprofessional" Plan of Correction. Therefore, Queer's First Amendment retaliation claim was properly dismissed.

Queer also contends that the District Court erred in dismissing his claim against two particular County employees – Loughner and Zecchini. As we have previously noted, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown when a supervisor either personally directs the retaliatory action or has actual knowledge of, and acquiesces in, the retaliatory action. *Id.* With respect to Loughner and Zecchini, the record does not reflect that they were personally involved in the decision not to renew ICC's contract. To the contrary, the record reflects that these individuals were left out of the decisionmaking process. Thus, in addition to

10

the problems with Queer's claim that we have already discussed, he faces an additional obstacle in bringing suit against these individuals in light of the fact that the record does not establish that either Loughner or Zecchini were personally involved in the County's decision not to renew ICC's contract.

IV.

For the foregoing reasons, we will affirm the order of the District Court.