**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-4562

_____

ROBERT A. GARDNER,
Appellant

v.

SCHOOL DISTRICT OF PHILADELPHIA

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court No. 2-13-cv-02756)
District Judge:  Hon. Robert F. Kelly

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
November 2, 2015

Before:  McKEE, *Chief Judge*, JORDAN, and VANASKIE, *Circuit Judges*.

(Opinion Filed:  December 17, 2015)

_____

OPINION*

_____

* This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Robert A. Garner appeals an order of the United States District Court for the Eastern District of Pennsylvania granting summary judgment against him and in favor of the School District of Philadelphia (the "School District" or "District") on his claims that the School District discriminated and retaliated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*., and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq*. For the reasons that follow, we will affirm.

## I. Background[1]

While the factual background of this case is extensive, the following abbreviated version suffices to give context for our decision.

Starting in May 2011, Garner and the School District engaged in an ongoing series of communications in which Garner submitted reports from his physicians and requested leave to recover from his physical ailments, and the District responded to those requests based on the information Garner provided and its own inquiries and evaluations of Garner's condition. Over the course of approximately two years, from May 2011 until Garner filed his complaint against the School District in May 2013, the District authorized all of Garner's leave requests except for five weeks from November 7 to December 12, 2011, and twelve weeks from March 13 to June 5, 2012. Those interludes are at the heart of this dispute.

---

[1] Consistent with Federal Rule of Civil Procedure 56(a), we set forth the facts in the light most favorable to Garner. *See infra* n.5.

Garner became a school police officer sometime in 2000 or 2001 and is a member of a collective bargaining unit represented by Teamsters Local Union 502. After a work-related injury on November 19, 2010, the District cleared Garner to return from a leave of absence by no later than May 3, 2011. On that date, instead of returning to work, Garner notified the School District that he needed to take leave "due to a serious medical condition" that left him "unable to perform the essential functions of [his] job." (App. 366.) Thereafter, Garner had appointments with the District's office of Employee Health Services ("EHS") at which he presented information from his physicians documenting his health problems.

For several months, the School District approved Garner's requests for leave, allowing him to use his accumulated paid sick leave days. At his appointment on October 3, 2011, however, EHS indicated that Garner should return to work on November 7, 2011. Although Garner had submitted a physician's report at the October 3, 2011 appointment, the report did not address Garner's ability to work, a problem which he later acknowledged. Garner was notified of his scheduled return date and signed a form stating that he understood that "failure to return to work on the above date will result in my being coded unauthorized leave without pay." (App. 183.)

Garner's union representative, Robert McGrogan, requested a third-party evaluation to determine whether he was able to work, but EHS denied that request because the physician's report Garner submitted did not contradict EHS's own

3

determination.[2] EHS also reiterated to Garner that he was scheduled to return to work on November 7, 2011, and that "[f]ailure to return to work on [that date] will result in being placed in no pay status and a disciplinary hearing will be scheduled for you." (App. 421.) McGrogan also submitted a physician's letter asking that Garner be excused from work until October 31, 2011, but the letter did not purport to excuse Garner beyond that date.

Garner did not return to work on November 7, 2011. In mid-November, the union faxed to EHS two notes from a gastrointestinal medical practice asking that Garner's absences be excused from November 15, 2011 until December 5, 2011, but an EHS physician concluded that the notes demonstrated no medical severity. Consequently, the School District notified Garner that it would hold a hearing on December 5, 2011 to address his unauthorized absences and determine whether he had violated the District's sick leave policies.

At the December 5 hearing, Garner and McGrogan submitted a physician's report that documented Garner's gastrointestinal symptoms but did not specify whether Garner was unable to work. The School District directed Garner to bring an updated report from his medical specialist to an appointment with EHS on December 12, 2011. At the time of that appointment, however, Garner brought only a note from a physician's assistant affirming that Garner had received medical care on December 5, 2011 and was able to return to work. Accordingly, EHS cleared Garner to return to work on December 13,

---

[2] Under the agreement between Garner's union and the School District, an employee who disagreed with the District's decision that the employee should return to work was entitled to ask for a third party evaluation, provided that the employee's doctor disagreed with the recommendation of EHS.

2011. The District also notified Garner that his absences from November 7 through December 12, 2011 would be treated as unauthorized absences without pay, and that he would be placed on strict probation for one year.

On January 19, 2012, after Garner called out sick four separate times within a two-week period, a supervisor issued him a warning letter. On January 23, 2012, Garner filed an application under the Family Medical Leave Act, requesting continuous, indefinite leave effective January 19, 2012. The application affirmed that Garner was "unable to function [at] work" and "unable to perform any of his[] job functions due to [his medical] condition." (App. 203.) EHS determined that Garner did not qualify for leave under the FMLA because he had not worked 1,250 hours in the 12 months prior to the date of his request. However, EHS approved Garner to take sick leave until February 13, 2012, the date of his next follow-up appointment, and again instructed him to bring "[m]edical documentation from your physician." (App. 117.)

At the next appointment, Garner submitted a brief doctor's note that did not address Garner's ability to work, so EHS determined that Garner should return to work on March 12, 2012. The School District allowed him to use his sick days until that time. In directing Garner to return to work, the District also reminded him that, if he disagreed with the return-to-work date, his union could request a third-party evaluation, provided that EHS received such request "within ten (10) working days of your scheduled appointment in EHS." (App. 119.) Garner again signed an acknowledgment that he had been notified of his scheduled return date and that he understood that "failure to return to

5

work on the above date will result in my being coded unauthorized leave without pay." (*Id.*)

Garner did not return to work on March 12, 2012; instead, that same day, McGrogan forwarded to EHS a letter documenting that Garner had had a cardiology appointment on February 29, 2012. EHS decided not to adjust Garner's return date based on the information supplied and determined that his absences following that date were unauthorized. McGrogan then sent EHS another physician's report stating that Garner was unable to work; he also asked that the District reconsider its decision. But a reviewing physician at EHS again concluded that Garner's documentation failed to demonstrate medical severity. By letter dated March 29, 2012, the School District notified Garner that it would hold another hearing on April 12, 2012 to address charges that he had violated the school's leave policy, failed to submit medical reports or absence cards, and had abandoned his job.

The next day, March 30, 2012, McGrogan submitted an untimely request for a third-party evaluation based on the discrepancies between the evaluations by EHS and Garner's primary care physician. At the April 12 hearing, McGrogan, as Garner's representative, relied on two physician's letters that EHS had previously determined did not demonstrate any medical severity.

The School District advised Garner on June 6, 2012 that, due to his "violations of sick leave policy and [his] failure to return to work when cleared to do so," the District's Office of Human Resources was recommending his termination, but that Garner, through his union, could appeal the decision before the recommendation became final. (App.

6

214.)  Accordingly, McGrogan filed a grievance to appeal the decision and submitted two doctors' letters affirming that Garner's health problems rendered him unable to work. While the School District was considering those new documents, McGrogan and Garner discussed the possibility of Garner taking a "restoration to health sabbatical" – an extended form of sick leave under which Garner's pay would be reduced but he would continue to receive health benefits and full credit towards his pension.  (App. 360.) Garner decided to request the sabbatical and, on June 17, 2012, the District granted the request.  The sabbatical leave was originally set to last for half the school year.  On January 28, 2013, however, Garner obtained another doctor's note which stated that he was "currently unable to work" due to his "chronic gastrointestinal condition" (App. 143), and the District extended his sabbatical leave until June 30, 2013.

On June 3, 2013, near the conclusion of his sabbatical leave, Garner asserted that he needed "more treatments before I can return to duty," and he sought "accommodations for [his] disabilities" under the ADA and PHRA "to use [his] sick leave and continuation of salary benefits to address [his] disability."[3]  (App. 393.)  A few weeks after that request, he also suffered a subdural hematoma for which he underwent brain surgery. EHS approved Garner's request for sick leave, and Garner resumed using his sick days when school reopened in September 2013.

---

[3] This was the first time Garner specifically requested accommodation under the ADA and PHRA.  *Cf. Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 317 (3d Cir. 1999) (noting that, while a specific request for accommodation may not always be necessary to initiate an interactive process between employee and employer to determine an appropriate accommodation, "it certainly helps bolster the employee's claim that the employer knew that the employee wanted accommodations").

Despite subsequent appointments with EHS, Garner has never returned to work. Instead, as a continuing employee of the School District, Garner has now used his entire bank of paid sick days and, at the time of the District Court's order, was on track to exhaust his allotted year of wage continuation benefits as well.

Garner filed his complaint on May 20, 2013, asserting claims of discrimination and retaliation under each of the ADA and the PHRA, for a total of four claims. Analyzing the two PHRA claims under the same standard as the two ADA claims,[4] the District Court granted summary judgment in favor of the School District on all four claims. Garner timely appealed.

---

[4] We apply the same analysis to claims under both the ADA and the PHRA, treating such claims as coterminous. *See Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 761 n.6 (3d Cir. 2004) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)).

## II.     Discussion[5]

### A.     The Discrimination Claim

Garner argues that the School District discriminated against him by failing to accommodate his disabilities, specifically by denying him "the ability to use his earned sick leave and wage continuation benefits." (Appellant's Br. 5.)  The ADA prohibits any covered entity from discriminating "against a qualified individual on the basis of disability … ."  42 U.S.C. § 12112(a).  The ADA further defines a "qualified individual" as a person "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).

Under our precedent, the plaintiff bears the initial burden of proving that he is qualified and, "if an accommodation is needed, the plaintiff must show, as part of [his] burden of persuasion, that an effective accommodation exists that would render [him] otherwise qualified."  *Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 670 (3d

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We exercise plenary review over the District Court's summary judgment rulings.  *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 317 (3d Cir. 2014).  "Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law."  *Carter v. McGrady*, 292 F.3d 152, 157 n.2 (3d Cir. 2002).  For a dispute over a material fact to be "genuine," the evidence must be such that "a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Bor. of West Chester, Pa.*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  *See also* F.R.C.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (explaining that a court must grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Cir. 1999) (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 139 (2d Cir. 1995)).  A disabled employee thus establishes a *prima facie* case for relief under the ADA "if [he] shows that [he] can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation."  *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001).

A defendant employer is under no obligation to maintain the employment of a plaintiff whose proposed accommodation for a disability is "clearly ineffective."  *Walton*, 168 F.3d at 670 (quoting *Borkowski* 63 F.3d at 139).  But an employee does not act unilaterally in suggesting a reasonable accommodation.  On the contrary, "[a]n employee's request for a reasonable accommodation requires a great deal of communication between the employee and employer," and "[b]oth parties bear responsibility for determining what accommodation is necessary."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999) (quoting *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).  Nevertheless, the interactive process between employee and employer "does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions."  *Taylor*, 184 F.3d at 317.  We have recognized that leave may be a reasonable accommodation when the plaintiff offers evidence that the leave would be temporary and "would enable the employee to perform his essential job functions in the near future."  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir. 2004) (citing *Criado v. IBM Corp.*, 145 F.3d 437, 444 (1st

10

Cir. 1998)); *cf. Fogleman v. Greater Hazleton Health All.*, 122 F. App'x 581, 586 (3d Cir. 2004) (concluding that indefinite leave does not constitute a reasonable accommodation).

The School District argues that Garner was not a qualified individual with a disability "because Garner cannot do his job at all, with or without an accommodation." (App. 58.) Garner does not address that dispositive issue except to baldly assert that he is "qualified" within the meaning of the ADA. Instead, his argument focuses on the District's purported failures either to honor his contractual rights or to engage in a good-faith interactive process. Whatever merit such contentions might have in a different context, they do not support a claim under the ADA if, in the first instance, Garner has failed to satisfy his burden of showing that his proposed accommodation would have qualified him to perform the essential functions of his job.

Garner stresses that his sick leave and wage continuation benefits are the only accommodations he has requested from the School District. Even viewed in the light most favorable to Garner, though, the record does not support the conclusion that those accommodations would have qualified him to perform the essential functions of his position, which included being physically present at a school. The record shows that, since he began to take sick leave in May 2011, Garner has not worked at all except during a short period between late December 2011 and early January 2012. Even on those few days when Garner nominally returned to work, he began calling out sick and, after multiple absences, filed an FMLA application affirming that he was "unable to function

11

at work"[6] and that his medical condition rendered him unable to perform "any of his[] job functions." (App. 203.) Since that time, not only have Garner and his physicians repeatedly opined that he is unable to work, but the objective reality is that Garner has not managed to return to work. The sick leave benefits which, in general, the School District has authorized in abundance, have not facilitated Garner's performance of his essential job functions "in the near future," *Conoshenti*, 364 F.3d at 151, and he makes practically no effort to meet his burden of showing otherwise.

Perhaps in tacit recognition that the District has generously approved extended sick leave for his conditions, Garner urges us to focus exclusively on the time between October 2011 and June 2012 as "the relevant period of Plaintiff's claim against Defendant." (Appellant's Br. 13.) To be sure, that span includes two periods of time when the School District did not approve Garner's absences. However, those facts also cut against the conclusion that sick leave would have "qualified" Garner under the ADA because, even without the District's blessing, Garner absented himself all the same, and those extended absences still did not put Garner in a position where he could perform the essential functions of his job. All the time Garner has spent away from work, whether or not approved, has not enabled him to actually function at work. We thus agree with the District Court that, even viewing the record in Garner's favor, no reasonable jury could

---

[6] Garner and his healthcare provider were not alone in this estimation. A warning letter from Garner's work supervisor, written at roughly the same time as the FMLA application, records that "[y]our continued absences greatly impede[] the safety and security of your work location and is a strain on the limited resources available to the school police department … ." (App. 200.)

12

conclude that Garner's requests to use sick leave and wage continuation benefits would have rendered him a qualified individual. In short, his discrimination claims must fail.

### C. The Retaliation Claim

Garner also claims that the School District retaliated against him when it refused to approve his requests for sick leave for the periods from November 7 to December 5, 2011 and from March 12 to June 5, 2012, and when it subsequently recommended that his employment be terminated.[7]

To establish a *prima facie* case of retaliation under the ADA and PHRA, "a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Williams v. Phila. Hous. Auth. Police Dept.*, 380 F.3d 751, 759 (3d Cir. 2004) (citations and internal quotation marks omitted).

Garner, of course, asserts that "he has met his prima facie case of retaliation under the [ADA] and PHRA." (Appellant's Br. 31.) But, even assuming that were true, our analysis cannot end there because the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to ADA retaliation claims, *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000), and, under that framework, the *prima facie* case serves as the first step, not the last. If an employee establishes a *prima facie* case of retaliation, "the burden shifts to the employer to advance a legitimate, non-retaliatory

---

[7] The record reflects that the District actually authorized Garner's use of sick leave on March 12, 2012, and that the period of unauthorized leave did not begin until March 13, 2012.

reason for its adverse employment action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the adverse employment action." *Id.* (internal quotation and editorial marks omitted). When the employer meets that burden, the burden shifts back to the employee, who then must "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Shaner*, 204 F.3d at 500 (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999)). Although the burden of production shifts under this three-part framework, the burden of persuasion remains, at all times, on the employee. *Id.* at 500-01 (quoting *Jones*, 198 F.3d at 410).

Upon reaching the third step in the *McDonnell Douglas* analysis, an employee may defeat a motion for summary judgment "by pointing 'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a … determinative[8] cause of the employer's action.'" *Jones*, 198 F.3d at 413 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Because the ultimate question is whether discriminatory animus determined the employer's action, an employee cannot discredit the employer's proffered reason simply

---

[8] In *Woodson v. Scott Paper Co.*, we clarified that, in a retaliation case, the plaintiff must show that retaliatory animus had a "determinative effect" on the employer's decision, and not merely that such animus was a "motivating factor." 109 F.3d 913, 931-35 (3d Cir. 1997).

by showing that the employer's decision was "wrong or mistaken." *Fuentes*, 32 F.3d at 765.

In answer to Garner's allegations that the School District retaliated against him by denying his requests for leave, the District has responded that it was merely "appl[ying] its medical leave policies by their very letter; Garner had numerous follow-up visits with EHS, and was required to present supporting medical information like any other employee on a medical leave." (Appellee's Br. 56.) With respect to Garner's claim that the District retaliated against his accommodation requests by recommending his termination, the District argues that there is no "evidence that [the School District's] disciplinary actions against Garner were motivated by some discriminatory animus rather than by the indisputable fact that Garner was *absent from work*." (*Id*. (original emphasis).)

Given the ample evidence supporting the School District's articulated reasons – well-documented and summarized in its June 6, 2012 letter to Garner – the burden returned to Garner to point to some evidence from which a reasonable factfinder could believe that the School District's reasons were a pretext for discrimination. Having ended his argument at the *prima facie* step, Garner fails to even address that burden. The District Court was thus correct to grant summary judgment against Garner on his retaliation claims.

## III. Conclusion

We will affirm the District Court's order granting the School District's motion for summary judgment with respect to all of Garner's claims.

15